DECISION
Southern Union Company ("Southern" or "Plaintiff") has filed the herein matter praying this Court exercise jurisdiction pursuant to G.L. 1956 § 42-35-7 and § 9-30-1. Southern, in its two-count complaint, seeks a declaratory judgment that, under the Department of Environmental Management's ("DEM" or "Defendant") rules and regulations, it is entitled to choose the method of remediation of a contaminated site, and that the DEM's hearing board, the Administrative Adjudication Division ("AAD"), does not have jurisdiction, pursuant to the Industrial Property Remediation and Reuse Act ("IPRRA"), § 23-19.14-1 et seq., to determine liability for the contamination of a site. DEM has moved for dismissal, pursuant to Rhode Island Superior Court Rules of Civil Procedure Rules 12(b)(1) and 12(b)(6), arguing that this Court does not have jurisdiction as alleged by Southern. Alternatively, Defendants argue, Southern has not exhausted all of its administrative remedies, and the matter properly belongs before the AAD on all issues. Jurisdiction is pursuant to § 42-35-7 and § 9-30-1 and Super. R. Civ. P. Rules 12(b)(1) and (6). *Page 2 
 I Facts and Travel
Southern is a Delaware corporation with its principal offices in Houston, Texas. DEM is a Rhode Island state agency. The underlying facts of this case involve the long sought after cleanup of the residential area in and around Bay Street in Tiverton, Rhode Island. On or about September 30, 2002, as part of the Mount Hope Bay Sewer Project in Tiverton, Rhode Island, Starwood Tiverton LLC, a private residential developer, informed DEM of allegedly cyanide-based contaminated soil in the Bay Street area, identifiable by its blue color. Based on DEM's investigation of the contaminated site, including the sampling and testing of subsurface material, it concluded that the contamination occurred as a result of the dumping of manufactured gas plant waste. Further investigation led DEM to identify the Fall River Gas Plant, located within one mile of the Bay Street area, as the source of the contamination. The Town of Tiverton, Rhode Island, as owner of the contaminated site, and Starwood Tiverton LLC ("Starwood"), as operator of the construction project on the land, were each identified as a "Responsible Party." A "Responsible Party" is defined in both IPRRA and DEM's rules and regulations. See §§ 23-19.14-6 to 7; Rules and Regulations for the Investigation and Remediation of Hazardous Material Releases ("Remedial Regulations") § 3.60, 12 180 CRIR 001-15 to 17. According to both definitions, DEM holds responsible, among other parties, the title owner of the contaminated site, and "operator" of the contaminated site, where "operator" is defined as the entity "responsible for the operation of the activities" at the contaminated site. See id.; see also § 23-19.14-3(f) (definition of "operator" according to IPRRA); Remedial Regulations § 3.44, 12 180 CRIR 001-13 (definition of "operator" according to DEM's rules and regulations). *Page 3 
Pursuant to the Remedial Regulations, on October 8, 2002, DEM issued Letters of Responsibility ("LOR") to both the Town of Tiverton and Starwood, identifying their status as "Responsible Parties" for the compilation and stockpiling of contaminated soil in the Bay Street area, first noticed by area residents on or about August 16, 2002. As is customary in the LORs, "Responsible Parties" are required to conduct tests and submit plans in order to create an emergency, short-term resolution, as well as provide long-term remediation to the contaminated site, referred to as a "Site Investigation" within DEM's Remedial Regulations. The Town of Tiverton retained EA Engineering ("EA") to conduct a subsurface investigation of the allegedly contaminated site. EA uncovered widespread contamination, with the soil containing toxic levels of lead, arsenic, and cyanide, among other dangerous chemical compounds.
Following this discovery, a public meeting was held in Tiverton, Rhode Island. There, town officials, through resident testimony and the presentation of certain documents, concluded that the contamination was due in large part to the dumping of hazardous waste as landfill by the Fall River Gas Company during the 1960s and 1970s. Thereafter, on March 17, 2003, DEM sent a LOR to Southern (d/b/a New England Gas Co.), as alleged owner of the former Fall River Gas Company, identifying a duty to conduct an investigation and, if necessary, proper remediation of the land.
As it did with the Town of Tiverton and Starwood, DEM ordered Southern to then submit a Site Investigation Work Plan ("SIWP") by April 10, 2003 "outlining [Southern's] plans to further investigate" the contaminated site. See March 17 LOR to Southern at 2. Southern was then to obtain permission from land owners to enter and investigate the contaminated site, culminating in a Site Investigation Report ("SIR"). The SIR was *Page 4 
required to contain a checklist created by DEM and proposed remedial alternatives. Id. Despite denying, as it does now, all liability for the Bay Street contamination, Southern retained an environmental consultant to investigate the contaminated site in order to create the required SIWP to investigate 68 private properties in the contaminated area. By June of 2003, Southern's investigation included 75 properties. On or about October 31, 2003, Southern submitted its first SIR to DEM. The report accounted for approximately 67[1] of the 92 separate properties within the contaminated site. Southern's engineering company stated that approximately 7 of the 75 property owners did not provide access for testing. Later that same year, on December 5, 2003, Southern submitted four individual SIRs for 9 (of the 67) properties where Southern concluded other past owners had contributed to the contamination. By August 25, 2004, Southern had submitted another SIR for the original 67 properties (Phase II), which also included an additional 25 new properties which were not in the first SIR in October 2003. The investigation of those properties and the Phase II SIR carried into 2005, culminating, after a request and grant of an extension by DEM, in a deadline of August 15, 2005 for Southern to have completed its SIR for all properties. Southern submitted an SIR, which DEM rejected.
On November 23, 2005, DEM sent a Notice of Intent to Enforce ("NOIE") to Southern, stating that the most recent SIR, along with its supplement, was insufficient, and could only be cured by completing three actions:
 "1. Submit a minimum of three (3) Remedial Alternatives for remediating all soil contamination in the Bay Street Neighborhood Study area to meet RIDEM's Method 1 Residential Direct Exposure Criteria as outlined in the Remediation Regulations on or before January 4, 2006; *Page 5 
 2. Submit any outstanding investigation sampling results and laboratory analysis, completed after the August 15, 2005 SIR submittal, for the remaining properties by January 4, 2006;
 3. Conduct Public Notice to all residents of the Bay Street Neighborhood Study Area within 14 days of receipt of RIDEM's Program Letter." November 23, 2005 NOIE to Southern at 4-5.
In fact, Southern had attached a letter to its August 15, 2005 SIR, informing DEM that there was not enough time to complete the report and that the submission of remedial alternatives was premature at that time. Thereafter, on December 14, 2005, Southern responded to the NOIE by alleging that Southern had still not been adjudged liable for any or all of the contamination; that DEM was disregarding its own rules and regulations; and that DEM had not provided Southern with enough time to comply with the LOR and create the SIR. Finally, in September 2006, DEM issued a Notice of Violation ("NOV"), later amended, to Southern for its failure to comply with DEM's requests allegedly pursuant to IPRRA and DEM's Remedial Regulations. The NOV assessed penalties of over $250,000, and $1,000 per day following the issuance of the NOV until full compliance. On October 16, 2006, as is its right pursuant to the Remedial Regulations, Southern filed a hearing request with the AAD, challenging the NOV issued against it. That case is currently in the discovery phase, pending before the AAD.
The underlying dispute in this matter concerns the most recent SIR submitted to DEM. In its August 15, 2005 SIR, Southern announced that it intended to perform a Method 3 process for determining remedial objectives for the contaminated site, which included performing a Method 3 Human Health Risk Assessment. DEM has, since the August 15, 2005 SIR, rejected all documents submitted by Southern relevant to a Method 3 plan, and ordered Southern to perform a Method 1 remedial process. Within the Remedial *Page 6 
Regulations, DEM has provided three types of remedial processes, by which a responsible party determines the appropriate remedial action for a particular contaminated site. See Remedial Regulations § 2.02, 12 180 CRIR 001-6 to 7. The relevant portion of § 2.02 is as follows:
 "The [DEM] has facilitated the remedial process by establishing three methods for determining protective remedial objectives for the hazardous substances found to exist in soil and/or groundwater at any given contaminated site. Method 1 is a series of tables establishing conservative risk-based cleanup levels for commonly encountered hazardous substances. Method 2 is a process by which the performing party can supplement or modify the Method 1 clean up levels to reflect site-specific circumstances. Method 3 corresponds to site-specific human health and/or ecological risk assessments which may be used to assessing baseline risk and subsequently determining appropriate remedial objectives for all impacted data." Id.
Essentially, Method 1 is carried out by a "Responsible Party" by bringing the levels of certain toxins found in either the soil or groundwater down to levels determined by DEM, as listed in the Remediation Regulations. Method 2 is a slight variation of Method 1, and is used where a certain toxin is not listed in the Method 1 chart, or a "Responsible Party" seeks to bring the toxicity in the soil or groundwater to a different level than that mandated by the Method 1 charts. Method 2 is site-specific, as is Method 3. Method 3, however, is entirely site-specific, where the desired or acceptable toxicity level of the soil or groundwater is determined not by complying with or amending the Method 1 levels, but by performing a site-specific investigation of the entire contaminated site.
Between the submission of the August 15, 2005 SIR and the November 25, 2005 NOIE, DEM and Southern arrived at an impasse whereby Southern alleged it could elect one of the above methods of determining remedial objectives, while DEM maintained that due to the failure to achieve certain alleged preconditions to Method 3, contained in the Remediation Regulations, Southern had to remediate according to Method 1. The NOIE *Page 7 
alerted Southern that DEM was not permitting the use of Method 3, demanding the use of Method 1, and requiring Southern to submit a minimum of three remedial alternatives for the contaminated site under Method 1. Southern, in response, alleged that it had the option of choosing among Methods 1, 2, and 3, that it selected 3, and that DEM failed to give Southern the time to compile the data and work plans necessary to submit three remedial alternatives under Method 3. DEM has maintained from the service of the NOIE that it has rejected the request to implement Method 3. In its pleadings with this Court, DEM notes several conditions precedent to implementing Method 3, as it interprets its own Remediation Regulations, that it alleges Southern could not possibly satisfy. Therefore, DEM has ordered Southern to perform under Method 1. This is the posture of the parties as they appear before this Court.
On April 19, 2007, Southern filed this two-count request for relief. Southern requests this Court, pursuant to § 42-35-7, declare that DEM's action preventing Southern from developing Method 3 remedial objectives, as well as the necessary preparation leading to that end, is an invalid and improper application of the Remediation Regulations. Southern prays this Court compel DEM to follow its rules and regulations as Southern interprets them. Further, the complaint requests this Court to declare that neither the DEM nor the AAD has jurisdiction to determine whether Southern is a "Responsible Party" as defined in IPRRA. Southern contends only this Court has jurisdiction to determine liability pursuant to IPRRA. DEM, through its Motion to Dismiss filed May 21, 2007, contends that this Court does not have jurisdiction at this stage of the proceedings, and an order should enter returning the case to the administrative level. DEM claims that not only does the AAD have jurisdiction to hear the claims currently before this Court, but, in *Page 8 
consideration of the statutory doctrine of exhaustion of administrative remedies, the AAD process should run its course before the matter can come to the Superior Court. Defendant's Motion to Dismiss is now before the Court.
 II Standard of Review
The "sole function of a motion to dismiss" pursuant to Rule 12(b)(6) is "to test the sufficiency of the complaint." McKenna v. Williams,874 A.2d 217, 225 (R.I. 2005) (quoting Rhode Island Affiliate, ACLU, Inc. v.Bernasconi, 557 A.2d 1232, 1232 (R.I. 1989)). "Rule 12(b)(6) does not deal with the likelihood of success on the merits, but rather with the viability of a plaintiff's bare-bones allegations and claims as they are set forth in the complaint." Hyatt v. Vill. House Convalescent Home,Inc., 880 A.2d 821, 824 (R.I. 2005). This Court, under this standard, assumes that the allegations in the complaint are true. Estate ofSherman v. Almeida, 747 A.2d 470, 473 (R.I. 2000). A Rule 12(b)(6) motion is not to be granted unless the defendant can establish that plaintiff has no entitlement to relief. Estate of Sherman,747 A.2d at 473; Gagnon v. State, 570 A.2d 656, 657 (R.I. 1990). "A motion to dismiss under Rule 12(b)(6) will only be granted `when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim.'" Hendrick v. Hendrick, 755 A.2d 784
(R.I. 2000) (quoting Bruno v. Criterion Holdings, Inc., 736 A.2d 99, 99
(R.I. 1999)); Bragg v. Warwick Shoppers World, Inc., 102 R.I. 8, 12,227 A.2d 582, 584 (1967). *Page 9 
 III Analysis A. Responsible Party and IPRRA
In Count II of its complaint, Plaintiff seeks a declaration from this Court that, pursuant to IPRRA, only the Superior Court may determine who a "Responsible Party" is, if that issue is contested during a remediation process. It claims that the General Assembly vested exclusive jurisdiction for determining who a "Responsible Party" is with this Court. As support for this contention, Southern notes the relationship between IPRRA and § 23-19.1-1 et seq., the Hazardous Waste Management Act ("HWMA"). The HWMA predates the enactment of IPRRA by almost two decades, and, according to Southern's theory, IPRRA clarifies and affirms the HWMA. Specifically, within the HWMA, Southern points to at least two separate sections where jurisdiction is exclusive with the Superior Court. See § 23-19.1-15 ("The superior court for Providence county shall have jurisdiction to enforce the provisions of this chapter and any rule, regulation, or order issued pursuant to this chapter"); § 23-19.1-22(b) ("Proceedings brought pursuant to this section shall be instituted by filing a complaint in the superior court").
Plaintiff argues that said provisions are imputed to IPRRA by various references to the federal equivalent of IPRRA, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "Superfund"), 42 U.S.C. § 9601 et seq., and by implication within sections of IPRRA itself. See § 23-19.14-6 ("defining "Responsible Party" and "reaffirm[ing] the applicable provisions of [the HWMA]"); § 23-19.14-17 ("Nothing in this chapter shall be construed to prevent the state from subrogating its authority to pursue cost recovery or assess punitive damages as part of a settlement action"); §23-19.14-18(b) ("Any rules or policies promulgated pursuant to this chapter *Page 10 
shall, to the maximum extent practical, be compatible with the rules, regulations, procedures, and standards promulgated [under CERCLA]"). Consequently, the argument follows, that certain decisions and evaluations — such as determinations or liability as alleged in this case — are made exclusively by the Superior Court pursuant to the sections within IPRRA that correspond to the jurisdictional sections of the HWMA.
With respect to these contentions, DEM disagrees. First, Defendant contends that the HWMA's exclusive jurisdiction sections do not apply to IPRRA. It notes that in all of the HWMA and IPRRA, nowhere is there precise language linking the two in that fashion, and there is no section within IPRRA that grants the Superior Court exclusive jurisdiction as alleged by Southern. Second, DEM contends that given the structure of Title 23, specifically the interplay between the HWMA and IPRRA, it follows that while the two are meant to be read together, one does not supercede the other, especially in the area of liability determinations under IPRRA. Third, according to DEM, a reading of IPRRA, along with the regulations enacted pursuant to it, clearly indicates that the General Assembly intended determinations of liability, to wit, "Responsible Party," to be made by DEM. It argues that the pertinent sections of IPRRA, the Administrative Penalties for Environmental Violations Act ("APEVA"), § 42-17.6-1 et seq., and the Administrative Adjudication of Environmental Matters Act ("AAEMA"), § 42-17.7-1 et seq., grant to the DEM, through its Director, the power to make a wide range of determinations, including who a "Responsible Party" is.See § 23-19.14-18 (Powers of the Director); § 42-17.6-2 (Authority of Director to Assess Penalty); § 42-17.7-6 (Hearings-Orders-Concurrent Jurisdiction); Remedial Regulations, § 3.6, 12 180 CRIR 001-15 to 17 (definition of *Page 11 
"Responsible Party"); Remediation Regulations, § 2.02, 12 180 CRIR 001-5 to 7 (Operation and Enforcement).
In order to invoke this Court's jurisdiction, Southern has brought Count II pursuant to § 9-30-1 of the Uniform Declaratory Judgments Act ("UDJA"), which provides:
 "The superior or family court upon petition, following such procedure as the court by general or special rules may prescribe, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree." Section 9-30-1.
The UDJA permits the trial justice to "facilitate the termination of controversies," and that power is broadly construed. Malachowski v.State, 877 A.2d 649, 656 (R.I. 2005). The decision to use the powers given under the UDJA is "addressed to the sound discretion of the trial justice." Hagenberg v. Avedisian, 879 A.2d 436, 441 (R.I. 2005). That is, "[t]he decision to grant or to deny declaratory relief under the [UDJA] is purely discretionary." Sullivan v. Chafee, 703 A.2d 748, 751
(R.I. 1997). Plaintiff must allege a "justiciable controversy" or "injury in fact," which requires "`an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical.'" Meyer v. City ofNewport, 844 A.2d 148, 151 (R.I. 2004). The Court should consider factors such as whether there exists another remedy, the availability of other relief, whether the question to the Court may be readily presented, and whether there exists a pending action involving the same parties in which identical issues may be presented. Berberian v.Travisono, 114 R.I. 269, 271-74, 332 A.2d 121, 122-24 (1975). However, the existence of alternate methods of relief does not necessarily preclude this Court from entertaining the actions. Id.; but seeOwner-Operators Independent Drivers Ass'n v. State, *Page 12 541 A.2d 69, 73 (R.I. 1988) (noting "Legislature's objectives of judicial economy, fairness to litigants, and elimination of duplicative proceedings.")
In the matter before the Court, Southern has asked this Court to make a declaration, interpreting IPRRA, pursuant to which, at least in part, DEM has charged Southern with being a "Responsible Party." The Superior Court has the power to construe and determine "rights" and "other legal relations" as "affected by a statute." Section 9-30-2. This issue is one of statutory interpretation, a pure question of law, which is appropriately determined by the Court. Rossi v. Employees' Ret.Sys., 895 A.2d 106, 110 (R.I. 2006). Further, the determination of the specific powers of DEM under IPRRA is not pending before any other tribunal, including the AAD. Southern has not raised this issue in its administrative dispute, and therefore this Court, in answering the petition for declaratory judgment, would not create the existence of duplicative proceedings. Owner-Operators Independent Drivers Ass'n,541 A.2d at 73 (R.I. 1988). Therefore, this Court in its discretion will interpret IPRRA as necessary to determine DEM's authority to assess liability.
In 1978, the General Assembly enacted § 23-19.1-1 et seq., the HWMA, in order "[t]o protect the environment and the public health and safety from the effects of the improper, inadequate, or unsound management of hazardous wastes," providing the "assur[ance] [of the] safe and adequate management of hazardous wastes within Rhode Island." Section23-19.1-3(1) and (4). The HWMA also sought to "establish a program of regulation over the storage, transportation, treatment, and disposal of hazardous wastes, without interrupting current regulation of industrial waste disposal." Section 23-19.1-3(2). Pursuant to the regulatory scheme created by the HWMA, the Director of the DEM is "authorized to exercise all powers, direct and incidental," including the "adopt[ion] [of] any *Page 13 
plans, rules, regulations, procedures, and standards as may be necessary to ensure proper, adequate, and sound hazardous waste management and to protect the health and safety of the public, and the environment from the effects of improper hazardous waste management." Section 23-19.1-6.
As part of the massive legislative scheme created by Title 23, Chapter 19 — where every section deals exclusively with the care, treatment, disposal, etc. of hazardous waste in Rhode Island — the General Assembly enacted IPRRA in 1995. The policy of Rhode Island, expressed by IPRRA, is explicitly announced in § 23-19.14-2, which pertinently states:
 "(1) Activities are taken to control and eliminate contamination at industrial properties that are fair, consistent, and compatible with the current and reasonably foreseeable future use of the property;
 (2) Environmental barriers to economic redevelopment and beneficial reuse of contaminated properties are removed;
 (3) Opportunities are available for businesses to realistically manage their environmental liabilities;
 (4) Voluntary and cooperative clean-up actions are encouraged to the greatest extent possible; and
 (5) Processes for environmental clean-up and liability relief are effective and efficient and minimize transaction costs to the extent reasonably feasible in order to facilitate appropriate reuse of contaminated properties." Section 23-19.14-2
In consideration of the stated purposes of both IPRRA and the pre-existing HWMA, it is clear that the two statues should be read in pari materia.[2] "When confronted with statutory provisions that are in pari materia, this Court will `construe them in a manner that attempts to harmonize them and is consistent with their general objective scope.'" *Page 14 Kells v. Town of Lincoln, 874 A.2d 204, 212 (R.I. 2005) (quotingState v. Dearmas, 841 A.2d 659, 666 (R.I. 2004)) (emphasis deleted). This Court "presume[s] that the legislature intended every word, sentence or provision to serve some purpose and have some force and effect . . . [the Court] will not interpret a statute in a manner that would defeat the underlying purpose of the enactment." Pier House Inn,Inc. v. 421 Corp., 812 A.2d 799, 804 (R.I. 2002) (citation omitted). It is clear from the explicit language in § 23-19.14-6, for example, that IPRRA was drafted in order to complement the HWMA. See § 23-19.14-6
("The state reaffirms the applicable provisions of 19.1 of [Title 23]"). While the HWMA headlines the statutory chapter dealing with hazardous waste in Rhode Island, the series of sections enacted following the HWMA clearly reveals the General Assembly's attempt to concentrate explicitly on the wide range of issues beneath the broad umbrella of hazardous waste management. See Sutherland Stat. Const. § 51.02 (6th Ed.) ("where two statutes deal with the same subject matter, the more recent enactment prevails as the latest expression of legislative will.") Therefore, in light of the "fundamental principle of statutory interpretation that every effort is to be made to harmonize statutes," the HWMA and IPRRA will be read so as to give effect to both when possible. Tennessee Valley Authority v. Hill, 437 U.S. 153, 189 (1978).
According to IPRRA, DEM is charged with the "develop[ing], maintain[ing] and publish[ing]" of the objectives of an environmental cleanup. Section 23-19.14-4. DEM is also required to "develop and implement a process to ensure community involvement throughout the investigation and remediation of contaminated sites." Section23-19.14-5. Also within IPRRA is a statutory definition of "responsible parties." See § 23-19.14-6(a); see also § 23-19.14-6.1 (liability for releases of petroleum); § 23-19.14-7 (exemptions to *Page 15 
liability); § 23-19.14-8 (voluntary investigations and remedial actions). The Director, specifically, possesses the following powers and duties:
 "The director of the department of environmental management is authorized to exercise all powers, direct and incidental, necessary to carry out the purposes of this chapter. The director of the department of environmental management may adopt any plans, rules, regulations, fees, procedures, and standards that may be necessary to meet the declared policies and requirements of this chapter and receives all desired federal grants, aid, and other benefits." Section 23-19.14-18(a).
Pursuant to this vast power, DEM, by and through its Director, promulgated the aforementioned Remedial Regulations "to administer [IPRRA] for the investigation and remediation of contamination resulting from the unpermitted release of hazardous material. . . ." Remediation Regulations, § 1.01, 12 180 CRIR 001-4 (Authority). Similar to IPRRA, the Remediation Regulations define a "Responsible Party." Remediation Regulations, § 3.6, 12 180 CRIR 001-15 to 17. The process by which DEM's regulations organize the remediation process, beginning with the moment DEM "becomes aware of an actual or potential release of hazardous materials," is outlined in section 2.02 of the Remedial Regulations. Remediation Regulations, § 2.02, 12 180 CRIR 001-5 to 7. If DEM "determines that the reported release requires a response action," the site becomes a "contaminated site," and is thereafter the "focus of the regulatory framework described in [the Remedial Regulations]." Remediation Regulations, § 2.02, 12 180 CRIR 001-6. At this point, DEM responds by "informing known responsible parties of their obligations under [the Remedial Regulations] through the issuance of a Letter of Responsibility," the exact action Southern now challenges as invalid under IPRRA. Id.
Following the enactment of DEM's enabling legislation, § 42-17.1-1 et seq., the General Assembly enacted § 42-17.6-1, the APEVA, and §42-17.7-1 et seq., the AAEMA. *Page 16 
Under the APEVA, the "director may asses an administrative penalty against a person who fails to comply with any rule, regulation . . . or of any law which the director has the authority or responsibility to enforce." Section 42-17.6-2. Following the assessment of the administrative penalty, the liable party has a right to an adjudicatory hearing, the appeal from which follows the agency appeal route designated by 42-35-1 et seq., the Administrative Procedures Act ("APA"). See § 42-17.6-4 (right to adjudicatory hearing); § 42-17.6-5
(judicial review). The administrative hearing referred to in § 42-17.6-4
is to be held before the tribunal created by the AAEMA. "All contested enforcement proceedings, all contested licensing proceedings, and all adjudicatory proceedings under chapter 17.6 of title 42 [(the APEVA)] shall be heard by the division of administrative adjudication pursuant to the regulations promulgated by the director of environmental management." Section 42-17.7-2. Thereafter, pursuant to both chapter 17.6 and chapter 17.7, the DEM promulgated a series of rules and regulations in order to clarify the practice and procedure of appearing before the AAD. See generally 12 000 CRIR 003 (Rules and Regulations for Assessment of Administrative Penalties); 12 010 CRIR 001 CRIR (Administrative Rules for the Administrative Adjudication Division for Environmental Matters).
When this Court engages in statutory interpretation, it must "determine and effectuate the Legislature's intent and attribute to the enactment the meaning most consistent with its polices or obvious purposes." Jeff Anthony Props. v. Zoning Bd. of Review, 853 A.2d 1226,1230 (R.I. 2004) (citing State v. Burke, 811 A.2d 1158, 1167 (R.I. 2002)). Despite the maxim that when "the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference," this Court will not cursorily approve a *Page 17 
construction that is clearly erroneous or unauthorized. Labor ReadyNortheast, Inc. v. McConaghy, 849 A.2d 340, 345 (R.I. 2004) (quotingIn re Lallo, 768 A.2d 921, 926 (R.I. 2002)). Further, "[t]his court will not interpret legislative enactments in a manner that renders them nugatory or that would produce an unreasonable result." Defenders ofAnimals v. Department of Env. Mgt., 553 A.2d 541, 544 (R.I. 1989). It is fundamental that statutory language "should not be viewed in isolation."In re Brown, 903 A.2d 147, 149 (R.I. 2006) (citations omitted). In sum, "[w]hen performing [the] duty of statutory interpretation, this Court `consider[s] the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections.'" Id. (Citations omitted.)
From the plethora of statutes and regulations devoted to the identification and remediation of a contaminated site as a statutory scheme, it is clear that the General Assembly intended to vest DEM with broad regulatory and enforcement power. Id. The plain language of IPRRA grants DEM, by and through its Director, enormous power, "direct and incidental, necessary to carry out the purposes" of IPRRA. Section23-19.14-18. Pursuant to the statute granting DEM the power to administer penalties, the "director may assess an administrative penalty on a person who fails to comply with any rule, regulation . . . or ofany law which the director has the authority or responsibility toenforce. Section 42-17.6-2 (emphasis added). It appears that the "policies and obvious purposes" of those two statutes was to vest in the DEM the power to first identify who is responsible for the contamination, and thereafter, regulate its cleanup, assessing penalties if necessary. Jeff Anthony Props., 853 A.2d at 1230; see also
Remediation Regulations, § 2.02, *Page 18 
12 180 CRIR 001-5 to 7 (outlining beginning to end process of cleanup of contaminated site).
Moreover, while IPRRA does define "responsible parties," and provides for the "state" to "commence a civil action," those provisions are all ancillary to the explicitly broad powers and duties of the DEM and its Director. See 23-19.14-16 (providing the state with a cause of action to recover unpaid costs of cleanup incurred by the state and punitive damages therefrom); § 23-19.14-18 (powers and duties of the director). Thus, Southern's contention that the Superior Court's exclusive jurisdiction within the HWMA extends to IPRRA is unavailing.See §§ 23-19.1-15 and 22. The statutory connection between the HWMA and IPRRA is the "reaffirm[ing] [of] the applicable provisions of [the HWMA]. . . ." Section 23-19.14-6. It is well settled that "[w]here one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail, regardless of whether it was passed prior to the general statute. . . ." Sutherland Stat. Const. § 51.05 (6th Ed). Alongside the dearth of jurisdictional language, § 23-19.14-18 specifically grants to the Director of the DEM the power to effectuate IPRRA. To hold otherwise would "produce an unreasonable result." Defenders of Animals,553 A.2d at 544. Furthermore, in this matter, DEM's construction of IPRRA is entitled to deference. Labor Ready Northeast, Inc., 849 A.2d at 345. Therefore in light of the entire statutory scheme, this Court declares that pursuant to IPRRA, DEM is vested with the power and authority to enact and enforce regulations in order to determine who a "Responsible Party" is. DEM is not required to bring a separate action for the determination of liability in the *Page 19 
Superior Court, as argued by Southern. Accordingly, Count II of Southern's complaint is dismissed.
 B. Remedial Regulations Interpretation
Southern contends in Count I of its complaint that, pursuant to §42-35-7, this Court should, as opposed to DEM and its Director, interpret DEM's Remedial Regulations and determine its applicability as to Southern. Specifically, Southern argues that DEM has incorrectly applied its own regulations in rejecting Southern's bid to use a Method 3 plan for remediation at the Bay Street site, instead ordering Southern to create a remediation plan under Method 1 of the same regulations. As support for this contention, Southern notes that within the Remediation Regulations, which provide a step-by-step outline to the remediation process, the "Responsible Party" is given choices or options as to how to clean up a contaminated site. It points to several specific sections, and points to the uses of the words "or" or "may" in relation to remediation plans, as evidence that the method of remediation is at the election of "Responsible Party." See Remediation Regulations, § 2.02, 12 180 CRIR 001-6 (introducing remediation Methods 1, 2, and 3); Remediation Regulations, § 8.02, 12 180 CRIR 001-34 (describing method requirements for soil objectives); Remediation Regulations, § 8.04, 12 180 CRIR 001-57 to 58 (describing Method 3 Remedial Objectives). Lastly, Southern argues that under the federal CERCLA or Superfund remediation plans, not only is Method 3 the preferred choice, it is the only choice.
DEM argues that the AAD has jurisdiction to hear the matter, and cites various provisions of its own enabling statutes and regulations promulgated thereunder for this proposition. See generally § 42-17.1-1
et seq. (DEM's enabling statute); § 42-17.6-1 et *Page 20 
seq. (Administrative Penalties for Environmental Violations Act); § 42-17.7-1 et seq. (Administrative Adjudication of Environmental Matters Act); 12 000 CRIR 002 (Administrative Rules of Practice and Procedure for the DEM); 12 000 CRIR 003 (Rules and Regulations for Assessment of Administrative Penalties); 12 010 CRIR 001 CRIR (Administrative Rules for the Administrative Adjudication Division for Environmental Matters); 12 180 CRIR 001 (Remediation Regulations). DEM notes that by and through those statutes and regulations, there is an administrative scheme of adjudicating any and all conflicts that may arise between DEM and a party such as Southern. See § 42-17.7-2, 6; § 42-17.6-1, 4; 12 180 CRIR 001-78, § 14 (granting a party the right to a hearing before the AAD upon assessment of administrative penalty). Further, DEM argues that even if this Court determines it has jurisdiction under § 42-35-7 to declare judgment on the validity or applicability of rules, the doctrine of exhaustion of remedies requires the matter to be determined by the AAD prior to reaching the Superior Court.
Count I of Southern's complaint seeks to invoke the Superior Court's declaratory judgment jurisdiction as outlined in § 42-35-7 within the APA, which states:
 "The validity or applicability of any rule may be determined in an action for declaratory judgment in the superior court of Providence County, when it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff. The agency shall be made a party to the action. A declaratory judgment may be rendered whether or not the plaintiff has requested the agency to pass upon the validity or applicability of the rule in question." Section 42-35-7.
Pursuant to § 42-35-7, in order to obtain relief, "appropriate facts must be established from which the trial justice may determine that an actual controversy relating to the validity of the agency's rules exists." Millet v. Hoisting Engineers' Licensing Division of Dept.of Labor, 119 R.I. 285, 293, 377 A.2d 229, 234 (1977). The Rhode Island Supreme Court *Page 21 
has held that "the Legislature clearly intended to give the Superior Court discretionary power" as to whether to entertain such petitions under § 42-35-7. Eastern Van Lines v. Norberg, 114 R.I. 110, 113,329 A.2d 197, 199 (1974). "It does not follow that the language of § 42-35-7
mandates that the Superior Court must entertain the action for declaratory judgment." Id.
While this Court could invoke jurisdiction pursuant to § 42-35-7 using its discretion, at this point in the proceedings, this Court finds the claims of Count I should be completed through the administrative process that has begun and is before the agency with the jurisdiction and expertise to determine accordingly the issue already before it. Count I should be presented to the AAD rather than the Superior Court.
Pursuant to § 42-35-7, a case such as this appears in the Superior Court only by grace and not by right. Eastern Van Lines,114 R.I. at 113, 329 A.2d at 199; Sullivan, 703 A.2d at 751 (exercise of jurisdiction on petition for declaratory judgment is wholly discretionary). Alternatively, seeking a declaratory judgment under § 42-35-8 makes the agency ruling a final order reviewable according to the provisions of the APA. Section 42-35-8 provides:
 "Each agency shall provide by rule for the filing and prompt disposition of petitions for declaratory rulings as to the applicability of any statutory provision or of any rule or order of the agency. Rulings disposing of petitions have the same status as agency orders in contested cases." Section 42-35-8.
The DEM has, pursuant to this section of the APA, promulgated a set of rules of procedure in order to file such petition. See 12 000 CRIR 002-5 to 7, § 6. Under this agency rule, a party may petition the Director of the DEM, and "ask for a declaratory ruling as to the applicability of the agency's rule to the petitioner's particular circumstances."Ambeault v. *Page 22 Burrillville Racing Ass'n, 118 R.I. 310, 315, 373 A.2d 807, 809
(1977). Given this avenue of relief, the Supreme Court of Rhode Island has even suggested that under the doctrine of exhaustion of remedies, a petitioner, seeking a declaratory judgment, has an "obligation" to initially seek relief through § 42-35-8. Greenwich Bay Yacht BasinAssociates v. Brown, 537 A.2d 988, 993 (R.I. 1988).
Further, this Court is also mindful that under the APA, "any person . . . who has exhausted all administrative remedies available to him orher within the agency, and who is aggrieved by a final order in a contested case is entitled to judicial review" of that order.[3]
Section 42-35-15(a) (emphasis added). It is well settled that an aggrieved party must exhaust all administrative remedies before resorting to the judicial system for relief. McKart v. UnitedStates, 395 U.S. 185, 193 (1969); Burns v. Sundlun, 617 A.2d 114, 116
(R.I. 1992). The exhaustion rule mandates the withholding of judicial review "until the administrative process has run its course." U.S. v.Western Pacific Railroad Co., 352 U.S. 59, 63 (1956); R.I. EmploymentSecurity Alliance v. Department of Employment Training, 788 A.2d 465,467 (R.I. 2002). Following the McKart decision, which served initially as one of the most comprehensive discussions of the doctrine, courts have identified the following as the primary purposes of the exhaustion requirement:
 "First, it carries out the congressional purpose of granting authority to the agency by discouraging the `frequent and deliberate flouting of administrative processes [that] could . . . encourage[e] people to ignore its procedures.' Second, it protects agency autonomy by allowing the agency the opportunity in the first instance to apply its expertise, exercise whatever discretion it may have been granted, and correct its own errors. Third, it aids judicial review by allowing the parties and the agency to develop the facts of the case in the administrative proceeding. Fourth, it promotes *Page 23 
judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency." Andrade v. Lauer, 729 F.2d 1475, 1485 (D.C. Cir. 1984) (citing McKart, 395 U.S. at 193-95); Almeida v. Plasterers' and Cement Masons' Local 40 Pension Fund, 722 A.2d 257, 259 (R.I. 1998).
This Court notes that the parties have already begun an administrative action before the AAD, where Southern is challenging the NOV received for its alleged transgressions with regard to the Bay Street area contamination and remediation efforts. The action currently before the AAD is essentially identical in substance to Southern's Count I. The herein matter is a dispute centered around whether Southern may elect to perform a Method 3 remediation or whether DEM can order a Method 1 remediation pursuant to the Remediation Regulations. The action pending before the AAD — between the same parties — involves Southern's refusal to comply with DEM's orders to perform the Method 1 remediation, as opposed to the Method 3 remediation, and the legitimacy of the fines and administrative penalties accompanying that refusal. Southern has refused to comply with DEM's Method 1 mandates, due in large part to the assertion that it may elect to perform a Method 3 remediation, which is the essence of the Superior Court matter. The "pending [of], at the time of the commencement of the declaratory action, another action or proceeding which involves the same parties and in which may be adjudicated the same identical issues that are involved in the declaratory action," is one of the main factors to be considered in determining whether to grant declaratory relief. Berberian v.Travisono, 114 R.I. 269, 273, 332 A.2d 121, 123-24 (1975). This Court's discretion, pursuant to § 42-35-7, may be exercised "whether or not the plaintiff has requested the agency to pass upon the validity or applicability of the rule in question," contrary to the implied "obligation" in Greenwich Bay. Section 42-35-7; Greenwich Bay YachtBasin Associates, *Page 24 537 A.2d at 993. The Rhode Island Supreme Court has also previously recognized, "without deciding, that both the [agency] hearing and the petition for declaratory judgment could be contemporaneous" in a particular matterEastern Van Lines, 329 A.2d at 200. Nevertheless, in the instant matter, this Court finds that the Plaintiff must first exhaust its administrative remedies. See Andrade, 729 F.2d at 1485;Almeida, 722 A.2d at 259.
Due to the extremely technical and highly scientific nature of the facts of this matter, this Court will allow the AAD to proceed with the matter in its usual course. Southern would have this Court take from the AAD a pending case in an interlocutory fashion. However, it is clear from the statutes and regulations, that not only is the AAD more than capable to hear the issues presented here, it is the best forum in which to do so. See § 42-35-8; Remedial Regulations. The expertise of the Director of the DEM and the hearing officers of the AAD are better suited, at this point, to handle the issues. Andrade, 729 F.2d at 1485;see also James v. United States Dep't of Health Human Servs.,824 F.2d 1132, 1138 (D.C. Cir. 1987) (denoting the importance of the expertise at the administrative level). There simply has not been the factual development necessary to determine, for example, whether to mandate DEM to allow the use of a Method 3 cleanup. Id. Further, the use of the AAD here promotes judicial economy, because — despite all prognostications from Southern, including the premise that the Director has already made a decision, and the assumption that Southern will "lose" at the agency level — there is likely to be a resolution following the fleshing out of all issues surrounding the issuance of the NOV.[4] Id.;Portela-Gonzalez v. Secretary of the Navy, 109 F.3d 74, 78 (1st Cir. 1997) ("A *Page 25 
pessimistic prediction or a hunch that further administrative proceedings will prove unproductive is not enough to sidetrack the exhaustion rule") (citation omitted); Greene v. Meese, 875 F.2d 639, 641
(7th Cir. 1989) ("No doubt denial is the likeliest outcome, but that is not sufficient reason for waiving the requirement of exhaustion. Lightning may strike.") (Emphasis in original.)
By referring the issue to the AAD, the matter proceeds as the Legislature and the long history of administrative law intended, beginning at the administrative level, and thereafter, if necessary, proceeding through the well laid out statutory and regulatory scheme created by and pursuant to §§ 23-19.1-1 et seq., 23-19.14-1 et seq.,42-17.6-1 et seq., 42-17.7-1 et seq., and 42-35-1 et seq. SeeMcKart, 395 U.S. at 193-95 (exhaustion is more efficient rather than interjecting the judicial system at every stage of process). Southern further maintains, however, that this matter falls into one of the narrow exceptions to the exhaustion of administrative remedies doctrine. It argues that a suit need not appear before an agency, such as the AAD, where there is a claim that the agency has acted in excess of its statutory authority or has no jurisdiction. They cite mainly three cases for this proposition: Ansuini v. City of Cranston, 107 R.I. 63,264 A.2d 910 (1970); Taylor v. Marshall, 119 R.I. 171, 376 A.2d 712 (1977);Kingsly v. Miller, 120 R.I. 372, 388 A.2d 357 (1978).
Southern's reliance on those cases is misplaced. Ansuini andKingsley dealt specifically with challenging an ordinance or rule as facially unconstitutional or enacted in excess of statutory powers.Ansuini, 107 R.I. at 73, 264 A.2d at 915; Kingsley, 120 R.I. at 359,388 A.2d at 359. Here, Southern is not challenging a DEM regulation or rule as *Page 26 
unconstitutional or enacted in excess of statutory power; rather, it is challenging DEM's interpretation and application of its own rule. In fact, in Ansuini, the Supreme Court cites Nardi v. City ofProvidence, 89 R.I. 437, 153 A.2d 136 (1959) as an example of where a prayer for relief in the Superior Court should be denied due to the failure to exhaust administrative remedies. The Ansuini Court reasoned that the plaintiff's prayer for relief in Nardi was denied because "his attack on the invalidity of the ordinance was not premised on the proposition that the ordinance was patently defective, that is to say, invalid on its face, and the thrust of his contentions as to its validity was that the [action taken pursuant to the ordinance] was arbitrary to him." Id. at 73, 915. Similarly, Southern has questioned DEM's application of its regulation, which the Nardi Court identified as insufficient to overcome the exhaustion of remedies doctrine.Id. Further, a "crucial factor in Ansuini was the fact that the administrative agency in question had no power to hold its own rule invalid." Eastern Van Lines, 114 R.I. at 114, 329 A.2d at 199. That is not the case here, as DEM, through the AAD or its own internal procedures, can determine if one of its rules is invalid. See § 42-35-8; 12 000 CRIR 002-5 to 7, § 6. Moreover, in dealing with an agency regulation, "patent invalidity," as opposed to its application, is a question for the Courts. Ansuini, 107 R.I. at 73, 264 A.2d at 915.Ansuini and Kingsley are therefore inapplicable, as Southern is not alleging patent invalidity of a DEM regulation, but rather its application, which the Nardi Court held is in the agency hearing domain.
However, in Taylor, the Court seemingly extended the Ansuini holding to situations where a party, such as Southern, claimed an agency attempted to exercise jurisdiction in excess of its statutory power.Taylor, 119 R.I. at 179, 376 A.2d at 716. In some situations, the Supreme Court has allowed a party to avoid the administrative hearing, and seek direct *Page 27 
relief at the Superior Court usually through a request for declaratory judgment. Id.; Kingsley, 120 R.I. at 374, 388 A.2d at 359 (holding permissible instituting a declaratory judgment action after the party has begun to seek relief at the administrative level). However, the Court finds particularly applicable the reasoning of the dissent inTaylor, which characterized the majority in Taylor as "undermin[ing] the necessity of, and the purpose behind, administrative review . . . [and that] . . . [i]t is also clearly contrary to the weight of judicial thinking that has been expressed when this question has arisen in other jurisdictions." Taylor, 119 R.I. at 182, 376 A.2d at 718 (Kelleher, J., dissenting) (citations omitted).
Many courts, including the United States Supreme Court, have given great weight to statutory exhaustion requirements, such as those of the APA. See Sousa v. INS, 226 F.3d 28 (1st Cir. 2000) ("Whatever our own views, we are bound by precedent to apply the . . . exhaustion requirement in a more draconian fashion. The [United States] Supreme Court regards exhaustion requirements imposed by statute as more rigid than the common law doctrine"). Noting that jurisdiction pursuant to § 42-35-7 is entirely discretionary, this Court finds the instant matter is better suited for the administrative hearing level at this juncture, in accordance with the longstanding exhaustion doctrine. As noted by Justice Kelleher, case law supports the ideas that:
 "(1) while the declaratory judgment statute is remedial legislation, it is not to be regarded as an automatic substitute for administrative proceedings; (2) the Legislature never intended that a declaratory judgment action could be used to usurp or replace specific administrative relief, especially when the initial decision-making responsibility has been vested in an administrative tribunal; and (3) courts should not interfere with the administrative process by assuming jurisdiction of declaratory judgment actions." Id. at 182-83, 718 (Kelleher, J., dissenting) (citations omitted). *Page 28 
Accordingly, DEM's Motion to Dismiss Count I is also granted. Said dismissal is without prejudice as to Southern's raising the issues set forth in Count I before the AAD in conjunction with the matter presently pending before that tribunal.
 Conclusion
After reviewing the evidence and the memoranda submitted by the parties, this Court grants Defendant's Motions to Dismiss as to Counts I and II. Plaintiff's request for declaratory judgment pursuant to §42-35-7 is denied. Likewise, Plaintiff's request for declaratory judgment pursuant to § 9-30-1 is also denied. Accordingly, judgment shall enter for Defendant on Counts I and II of Plaintiff's complaint.[5] Counsel shall submit an Order consistent with this Decision.
[1] Southern's pleadings allege the report covered approximately 67 properties, while DEM's pleadings, as well as correspondence from DEM to Southern, alleges this SIR covered 68 properties.
[2] Black's Law Dictionary defines the term as, "on the same subject; relating to the same matter." Black's Law Dictionary 794 (7th ed. 1999).
[3] A contested case is defined as "a proceeding . . . in which the legal rights, duties, or privileges of a specific party are required by law to be determined by an agency after an opportunity for hearing." Section 42-35-1(c).
[4] Further, as argued by Southern at oral argument, the mere waste of resources is insufficient to circumvent the exhaustion requirement.Portela-Gonzalez v. Secretary of the Navy, 109 F.3d 74, 79 (1st Cir. 1997) ("The [trial] judge reasoned that a perceived waste of resources, in and of itself, can justify excusing nonexhaustion of administrative remedies. We think not.")
[5] In a final attempt to convince this Court of its position, Southern has filed two supplementary memoranda. The first suggests the inclusion of the word "administrative" to 2007 R.I. Senate Bill No. 397 Substitute B shows DEM's recognition of its lack of jurisdiction. Certainly, if DEM were concerned about its authority to name a "responsible party" under IPRRA, it would have been more specific. Clearly, the use of the word "administrative" is to insure that DEM retain all options of collection of fines and fees and is not for purposes of establishing jurisdiction in determining a "responsible party" under IPRRA. It is nothing more than the cautious approach of a legislative drafter, and since it was not acted on by the Legislature, it is of no effect and does not negate the clear, long-standing legislative intent to give broad power to DEM and its Director.
The second supplemental memorandum filed presented evidence in an attempt to refute DEM's contention that the Method 3 plan was rejected because Southern had failed in its duties under the Remedial Regulations. Attached to the second memorandum are handwritten notes of Dean Albro's, the Chief of DEM's Office of Compliance and Inspection, wherein he, at the time of the notes (approximately August 9, 2006), allegedly questions the factual support for the issuance of the NOV against Southern. This does not appear to be a "Rule 11 type" allegation of filing a document without basis, but an attempt to point out the weakness of the NOV. As such, it is information that can be presented to the administrative judge who may consider it along with other evidence in the case currently pending before the AAD.